I'm Alan Graff, Your Honor, for the Appellant Relator, Steven Mateski. As this Court has consistently held in cases involving public disclosure, the public disclosure bar, the threshold question that has to be answered before all else is whether the public disclosures revealed the allegations and transactions that are substantially similar to the false claims alleged by the relator. In this case, none of the public reports cited by Raytheon or the news articles disclose any of the allegations and transactions that are even remotely similar to Mr. Mateski's claims. Those reports and articles talk in general terms of an unspecified general technical problem that the Nipos VIIRS program was facing. It was an experimental program, there's no question about it, and it was running into enormous cost overruns. The government was quite concerned. There were many, many reports, both from Congress and from the GAO, talking about all of the unspecified technical problems, the management problems. Mr. Mateski, however, was a principal production planner and material control specialist for Raytheon in 2005, and he advanced to a senior technical support engineer in 2006. He had direct, first-hand, and independent knowledge of the false claims he was alleging. None of those false claims, as I said, are even remotely similar to any of what was said in these government reports. Now, the government had no prior knowledge of what Mr. Mateski was alleging, and we know that because when Mr. Mateski filed his complaint with the government under seal, the government within, I believe, a month held a high-level conference in which Mr. Mateski was debriefed, and when I talk about the government, I'm talking about all of the relevant government agencies that were involved in the Nipos VIIRS satellite system. That was Department of Commerce, Department of Defense, NASA. They all came, Department of Justice. They all came and debriefed Mr. Mateski extensively in July of 2006. They had follow-up meetings in 2007, two follow-up meetings in which he was extensively debriefed, and even past that. That's not what we look at, though, is it? Don't we look at what the public disclosures were and what his complaint was? This other stuff that happened after is not really part of what our case law says we look at, is it? Well, what has to be done is that this court must determine whether the public disclosures are substantially similar, to the allegations of his false claims. And isn't it your argument that we can just look at them and see that they're not? Yes, that is our argument. As a matter of law, the review standard for this question of whether a public disclosure triggers the jurisdictional bar of the False Claims Act is subject to de novo review. The court in this case, the district court in this case, didn't hold any sort of hearing. The court held a, it looks like apparently a very cursory examination of the false claims. It characterized the false claims as, oh, these false claims involve management deficiencies and technical challenges, and then characterized Mr. Metesky's complaints of false claims as the same thing. They went to a level of generality that was so general that, yes, you could say, oh, they're the same. They're identical, in fact. And that's what the court did. That was a wrong standard to apply. Do you have a case from our court that says it's the wrong standard to apply? I had trouble finding cases really addressing this issue of level of generality, at least in our court, although the Seventh Circuit has talked about it. Yes, I was going to say the Seventh Circuit has specifically dealt with this issue. I think it's implicit in this court's standard in the foundation aiding the elderly versus Horizon West, where the court said, this court said, we look for substantial similarity between the false claims allegations and the public disclosure. And we define that in two ways. Two things have to be revealed. This court followed the decision of the D.C. Circuit in a case called United States X-Rail Springfield Terminal versus Quinn. And they said, what has to be revealed in the public disclosure is the state of events and those events that show that the state of events is being misrepresented in some way. And that's exactly what Metesky did. You might charitably say that these public reports show the state of events, that the VIIRS program was being subject to all sorts of cost overruns, poor management, and indeed some of the reports— Well, that's true of a lot of projects. But can you just explain to me what is it that he added? What he added? Yeah. He added that the Raytheon was knowingly and deliberately failing to follow the contract specifications and in fact was falsifying tests, saying they performed tests when they didn't in fact perform them. They had altered the required books and records to show compliance with the government contract. He showed fraud. He showed the elements of fraud within the standard of the Bell Atlantic-Quambly case. I mean, in the complaint, the Fourth Amendment complaint, which is the relevant complaint here, he alleges very specifically the employees of Raytheon, who were his supervisors, who told him, change this, alter that, don't do this test, but say you did it. Okay, so let me—so the project is publicly disclosed. Oh, yes, the project is publicly disclosed. The fact that there is mismanagement and payments made that shouldn't have been made, I gather, is basically publicly disclosed. Well— At least in some level. Your Honor, there's no question that the reports were focusing on the mismanagement of the project and the gross cost overrun. Right. No question about that. What Metesky brought to the table was that there was fraud going on here, that the government wasn't aware of that. In fact, there is not a single one of these reports, GAO reports, government reports, that cites anything that Raytheon was deliberately not complying with the contract specifications and requirements. There's no report that Raytheon could point to showing that it was committing, in effect, fraud. It was falsifying books and records to cover up the fact that it wasn't performing what it was required to do on the contract specifications and mandates. And that was new, and it was certainly of great interest to the government. As I said, because the government in its actions spent a great deal of time debriefing Metesky. I mean, they were surprised—you could only describe it as being surprised—of his allegations. So that is criminal. There was a point where they were considering that. The government was—they brought in people to look at that issue. It wasn't pursued. Right. But they were certainly interested in the fact that Metesky was revealing this deliberate and intentional noncompliance with the contract specifications and standards. And as Your Honor correctly pointed out, the Seventh Circuit in Levitsky did say that when you go to this level of generalization to equate the false claims with the public disclosures, you can weed out a lot—you can just say, well, they're similar, and we get rid of a lot of cases, even though the false claims are stating material facts that are new and very, very important. So I—as the Court is aware of Levitsky, I can—Levitsky relied on several other— There's a whole line of Seventh Circuit clients about this. Okay, there's a whole line of— And you just want us to follow them. Well, yes, because that's exactly what the district judge did here. Well, he did the opposite. No. No. Well, no. Well, excuse me. Yes, he did the opposite. What he did was what Levitsky was criticizing. And what I think the judge—the district judge did is he misapplied this Court's ruling in Harshman v. Alcan Electric. In that case, there's language in that case which basically says, if the public disclosure gives enough information so that the government can conduct its own investigation, that's enough. But that is not what the actual facts of Harshman show. What happened in Harshman is that the public disclosure was very— I mean, it was a public disclosure of—I believe it was false— it was questions of whether they were affirmative action or set-asides, contractual set-asides. The relator just simply picked that up, but he knew of specific examples of contractors that were false. And he would try to get by the public disclosure bar on that basis. What this Court said, quite properly, is that the public disclosure allegations and the allegations of the false claims were basically identical. And all that was provided to the government was this peripheral information, which the government even itself had in its own files. So there was nothing important or critical that was provided to the government. So that's how that case is distinguished. And, in fact, a recent case, the United States X. Rel. Whipple v. Chattanooga-Hamilton County Hospital Authority, which is the Sixth Circuit, 782 F. 3rd. 260, criticized this idea that if a government decides to open an investigation, that is a public disclosure. It said that, in fact, a public disclosure requires, in fact, public disclosure through the instrumentalities provided by the statute. And a government decision to make to open an investigation is not a public disclosure. I think we understand your point. Okay. Thank you. I would like to reserve, as I said, three minutes for rebuttal. We only have one minute. One minute. Ten seconds. Thank you. Good morning, Your Honors. I'm pleased to court Kimberly Dunn on behalf of Raytheon Corporation. I want to address both the issue of what based upon means as well as the direct and independent knowledge. Based upon does not mean reveal specifics. It does not mean derive from. And it certainly doesn't mean identical. It means substantially similar. And I think the district court looked to Wang, which is still good law except for that third prong of the original source test. And Wang was a case which was very similar. What had been publicly disclosed were the general issues of transmission pumps related to these trucks. And what Wang did, because he'd been an on-the-ground engineer, was he added specifics in his complaint to that. And the court said, adding meat to the bones is not going to make a difference here. It doesn't mean there wasn't a public disclosure. And I think we have exactly that situation here. Despite the 134-page amended complaint, it really was quite generic. And after trying to get through, it was also a bit impenetrable. But once you get through that and you bucket the issues that were there, they fall within the issues that were discussed in the 60-plus public disclosures. We had over 50 media reports. Okay. Can we just back up for a second? So you're going right to substantially similar. But where was the allegation or transaction in the public disclosures? We need to either have an allegation of fraud or the pieces of fraud that we can put together, right, to have an allegation or transaction in the previous public disclosures. Can you point us where in the record there is something that is fraud suggested by the previous public disclosures rather than just incompetence? I don't think that is the standard. I don't think fraud needs to be alleged. I think the component parts of what would put the government on notice that there may be a reason to investigate. Fraud, though. It has to be investigate fraud. The fact that you have the Office of Inspector General, of Commerce, of NASA, of these various government agencies all were looking at this contract. But it could have been that they just said, why did we hire this incompetent company? It could be, why did we have engineers who don't know what they're doing? That's not fraud. That's not a key-tam action. So it has to be a public disclosure of at least the pieces of a reason to investigate something that might be fraud. So can you point me to why they might have thought this was fraud? When you look at all the reports that talk about the problems, the deficiencies, the severeness, it was systematic. There were massive cost overruns. There were failures. But can't we have cost overruns and equipment that doesn't work without fraud? Absolutely. And in fact, we think that was the case here. We don't think that the relator brings any evidence of fraud to the table. And we can talk about that in a minute. But the point about the public disclosures is that these are all factual issues that should put somebody on notice. On notice of what? On notice that there's a reason to investigate. And maybe there is fraud. Maybe there's not fraud. But oftentimes, that's how the government gets its information. Something seems amiss. There's a lot of problems. Can you point us to any case that says that you can have an allegation or transaction in the public disclosures without at least a suggestion of fraud? Well, I think the Wayne case is an example. There's no suggestion that the media reports talked about fraud. It talked about transmission problems. And what the court said was that should have put the government, or could have put, you don't have to be on notice, right? It's just whether there's enough information in the public domain that could put the government on notice. And here you had the number of agencies involved over a decade, lots of problems. They were. They were looking at this. There were investigations. It was public record. And so here you have a number of public disclosures about the issues exactly in the related complaint. Because really, as the district court noted, the very specific examples he gives are minutiae. They don't get beyond that there's, you know, deficiencies here. There seem to be defects here. Okay. Do you dispute that he is alleging intentional recordkeeping that's false, intentional use of the wrong materials? He's adding a layer of there is intentional fraud here that I haven't yet heard you say was in the previous public disclosures. Do you disagree with that? We have to take a step away from just his generic allegation of the word fraud. Okay. He does use the word fraud. He does use the word intentional. But this was a factual jurisdictional challenge. We introduced evidence that put him then to the burden to say he had direct and independent knowledge of fraud. Okay. And he didn't satisfy that burden because all he could do is say, no, I was working there. And he couldn't connect the dots that these deficiencies led to a false claim. But he, I mean, he has all kinds of allegations. That they used the prohibited materials, tin, when they were supposed to use something else. That they failed to report the location of 75 debris-generating locations. That they had problems with electrostatic discharge and they didn't maintain the right records. I mean, it goes on and on and on. They're very specific things that he says they were lying about. This is a false claims act case. And this did start as a criminal investigation. Obviously, it went nowhere. The government did investigate allegations of civil fraud. Obviously, declined to intervene. Okay. But what the relator alleges are two important facts. He alleges that there were problems with waivers. But he misunderstands what that really means. The waiver process is a process whereby the government can say, we're going to agree that we'll make an exception to a contractual requirement. And he acknowledges that. And so what he can't do is to then link that the government was knowingly defrauded. Because he has no evidence about the billing process. He has no evidence because he wasn't in the environment. Well, so maybe you should win on the merits. I mean, maybe the case should go forward and maybe you'll win. And probably you will win. But why does that – I mean, he has alleged fraud. And we can say later that it'll prove not to be true. But if we take the allegations of the complaint as true, he's alleging all kinds of lies. And I don't see them in the public disclosures. So I'm not sure how we can say that this was previously disclosed fraud of the type that he's alleging. The law doesn't require there to be a precise correlation, nor that the words fraud be uttered, nor that there be a link to the intent of the company at issue. What it says is that the allegations have to be substantially similar to what is in the public record. And that is the case here a number of times. Now, what does that mean? If it's in the public record that there are huge cost overruns, if it's in the public record that the government has paid amounts that the government shouldn't have paid, what else is there that would – that probably is enough to put the government on notice that there may be fraud. I think when you speak in terms of failures, defects, deficiencies, systematic problems, that constitutes enough for the government to make – Deficiencies in what? You can have defective specifications. There are engineering deficiencies. There are design defects. These are all the things that if you are to look at the examples that the relator gives, they fall within those. So say we have an enormous project, and you're building a rocket, and it is more expensive than planned, and the rocket isn't quite working. Now, that's publicly disclosed. Is there any type of fraud that could go on in the building of the rocket that would still be worth a key TAM action? Under your argument, would we say that if someone comes forward and says, every one of these bills is double billing, they're saying people are billing twice as many hours as they're actually billing, and they're sending it to the government. But we already know in previous disclosures that this project is too expensive. Are you saying that can't be a key TAM action because there's already reason to investigate this project? Absolutely not. Okay, so what's the difference then? Who had direct and independent knowledge. Okay, but that goes to a different issue, right? That's whether he's an original source. But I'm talking about is there substantial similarity. That's not about original source. So let's just talk about substantial similarity. What is the difference between what you're saying in this case about the public disclosures and this complaint compared to the hypothetical I gave you? Because if you put aside what the court, I think, appropriately characterized as minutiae, very isolated issues of the wrong part being used, which may have, by the way, been used because the government said it was okay to use. If you take that away from the complaint, all he is doing is using buzzwords. He's talking, oh, there's fraud. Oh, there's bad intent. Okay? And when we brought the subject matter jurisdiction motion, because we do believe there are disclosures, he couldn't support that. All he would have had to do is bring to the court's attention the direct and independent knowledge of fraud that he has. But that's a different part of the test. We first have to see whether there's substantial similarity. Then we might ask if he's an original source. But if there's no substantial similarity, we never get to original source. I think when you have as many public reports and articles that are talking about the problems on this program, congressional hearings, there was a lot of discussion. I mean, they had gone over the budget. There was a Nunn-McCurdy review. This program got a lot of attention. And you don't need to use the word fraud. It had so much attention and so many problems. The OIG, the Office of Inspector General, was involved. They're involved for a reason, because they're wondering if there's fraud. Okay, so you're now saying, okay, there were allegations and transactions. I'm not sure I agree with you, but let's give you that. We'll say the public disclosures were enough to suggest there might be fraud. Now, how do we get substantial similarity? How do we get from the general idea that there was a problem in this program to wrong materials, wrong recordkeeping, falsifying tests? How do you link those and say they're substantially similar? What case should I look to to say that those things count as the same under our case law? I mean, I think you could look at Wang, as I mentioned. I think you could look at other public disclosure cases where they talk in very general terms about what was out there. It was substantially similar in terms of the issues. His allegations are also at that high level of generality. Okay. I mean, other than these minor examples, which in and of themselves don't say anything, they are at this high level. Defects, deficiencies, testing failures. But they're not. I mean, you keep saying that. I mean, they talk about the specific materials, the specific records, the things that they were, the debris that was falling on the equipment. I mean, maybe you're just saying the entire complaint is minutia, and if it is, then maybe you win your case. But I don't see anything like these details. The specific things you said went wrong in this project, I don't see any of it in the public disclosures. I mean, I think they weren't as detailed as I think the court thinks they are, and if you look at them, they fall into certain buckets. They fall into, you know, poor record keeping, engineering problems because you're using drawings you shouldn't use, you had poor design. Those were all the types of issues that were in the public record. Okay. All right. With regard to the direct and independent, and I know you do have to find a public disclosure before you get to that issue, I do think it is important that he could bring nothing to the table to connect the dots on fraud. And there's a reason, and it's because he had very limited transparency into this program. Despite what I understand he wrote in the complaint. But when he was put to the test of having to put something out there for the court to show why he has direct and independent knowledge of fraud, he couldn't do it. And that's because... Well, he loses on original source anyway, right, because he didn't tell the government before he filed the complaint? He does lose that. But I think the inability to talk about actual evidence of fraud is what makes his allegations so similar to all that was in the public record. Because it really is no different when you get through, you know, what he's suggesting is detailed, because it was a 134-page complaint. But when you piece it apart, his allegations are no different than the types of allegations that were in the press, that Congress reviewed, that the OIG reviewed. Okay? Okay. Thank you. Thank you. We had very detailed allegations of fraud in the complaint. We believe we beat the test of Bell Atlantic versus Twombly. We pleaded facts, facts that are plausible inferences of fraud. And the government was not aware of this, just by the government's own actions and what it did. And, you know, it's alleged, and this is an issue of fact in this case, it's alleged that Mr. Metesky, and it's in the Fourth Amendment, Mr. Metesky was directed to falsify required recordkeeping to cover up the fact that they weren't conforming to the contractual mandates and specifications. So I grant, I, the facts are clear that the government was not aware of the fraud that was being perpetrated in this program. No, they certainly were aware of the cost of overruns and all of those issues, but they weren't aware of the fraud that was being perpetrated in this program. Thank you very much. Thank you very much. This matter is submitted, and we'll move on to the final matter on the calendar. And that is number 14, 5, 6, 7, 7, 9, 8, U.S. ex-rels Stephen Metesky and Raytheon. Same lineup. One graph for appellant, relator Stephen Metesky. The government has admitted itself in this complaint that, in fact the opposition to our opening brief, to Metesky's opening brief, that the P-1196 project on which Metesky worked did not involve classified information. Could we just pause for a second? Please don't say the name of the agency in this argument. You can just call it the agency, and we'll know what you're talking about. I do know. I'm not saying the... I know you haven't. We were planning to say that at the beginning, is just to remind you to not use the name of the agency. I am very well aware. And I... Why don't you speak into that? Excuse me. Pull it up closer. Can you hear me now? Very good. Yeah. Okay. So we're not dealing with this particular low-power electronic device on which Metesky was working for a year and a half, two years. We're not dealing with classified information in that program. The government has changed. It's saying it's some larger project of which the low-power electronic device is a part that contains the threatened disclosure or the threatened inadvertent disclosure of classified information, and that's why we need to dismiss the case. However, the government also admits that Mr. Metesky was not privy to any classified information about the larger project. So we're left with the what kind of classified information is he going to reveal if he has no knowledge of any classified information? I think that the government's problem in this case is that the very agency that is in question here is the source of all of this public information that can't be classified because it has a website, it has participated in producing television shows for this program. Everything in Metesky's complaint that the government has asked to be redacted on classified national security grounds is in the public domain by the very agency that put it in the public domain. And so it becomes... I think we understand. Okay. I sort of would like to hear from the government. All right. Then I will let you hear from the government. If the court has no further questions, because that is our argument. This was improper. I would like to say, Your Honor, that in this case we were denied a hearing when our case was dismissed as being unnecessary. Well, we take strong issue with that. The False Claims Act statute mandates a hearing, and we were denied a hearing. It's unnecessary. It's not going to show anything. What kind of hearing are you talking about? We're talking about a hearing when the government moves to dismiss. We wanted a hearing to test at least some of the allegations that the government says is the basis for this dismissal. We weren't even able to. Now, I know there's a secret declaration, which we will never see. Your Honors have probably seen it. But the specific false claims that are alleged by Metesky in his P1196 complaint were never redacted by the government, and they consist basically of essentially the same false claims that are in the previous case with the public disclosure. Isn't a key-tam action for the benefit of the government, though? And if the government thinks that it would be better off not spending resources watching this case for security problems, why shouldn't we defer to that? Why should your client get to continue on with a case that's supposedly for the benefit of the government if the government doesn't want it? Well, because the cases that deal with this issue say that the government does not have absolute discretion in this regard. The statute as it is crafted provides for a hearing, provides for, wait a minute, this is not a proper reason to get rid of this key-tam case. Okay, so do you dispute that a proper reason for the government to offer is that the government wants to save resources on watching for potential confidentiality breaches? That can be. But we have to look for a rational relationship between dismissing this particular key-tam case and protecting that interest. In this case, the government itself suggested the procedures that could be followed after it declined to intervene and suggested the procedures that this case could be prosecuted on an open basis and in effect not revealing classified information. Yes, the government is going to expend some resources. Every key-tam action involves the expense of resources. Now, but this case is not, you know, the cases that are cited, the Swift case, they involve $6,000 worth of false billing to the government. This case involves, we have suspected, many, many, many, many millions of dollars. And so it's not even remotely comparable. So that the dismissal of this case and the circumstances of this case, given the fact that the government has already admitted that Mr. Batesky never had access to classified information in either the P1196 project or in the larger project, which he's concerned about, I defy, it defies logic that we're going to have to spend a lot of money looking to protect classified information. Well, litigation sometimes gets into all kinds of things through discovery and other ways, so it's not just what you're applying. No, I appreciate you. It was exposed to. Yeah. Okay. Thank you. Thank you very much. This matter will stand submitted. The government. I'd like to ask the government a question. We haven't heard from you yet. Right. Okay. Good morning. May it please the court. Thomas Pohl for the United States. Before I begin, I would like to address one preliminary matter. Because we're here discussing the proper resolution of the government's motion to dismiss, the government will present argument for affirmance. But as the court is aware, Counsel for Raytheon is here. She's sitting at the table with me, Kimberly Dunn. If the court has any questions specifically for Raytheon, she is available to answer them. So I'd like to pick up on something that was noted by the panel. This case involves a claim brought by the relator in the government's name claiming injury to the government based on the government's substantive right to not be defrauded and seeking damages for the government. The government investigated the claims over a long period of time, not only found no violation, but further determined that continued litigation would harm the government's interests. The relator, notwithstanding this risk of harm, wants to proceed because the relator could receive a share of the government's recovery if the suit is successful. Congress enacted a provision to deal with precisely this situation. Section 3730C2A says that the government may dismiss an action notwithstanding the objections of the person initiating the action if the person has been notified by the government of the filing of the motion and the court has provided the person with an opportunity for hearing. Both of those conditions were met. In Sequoia Orange, this court said that motions to dismiss are evaluated using a two-part test, first identifying a legitimate government interest and second confirming that dismissal of the case is rationally related to that government interest. What is a hearing? Our position is that the hearing is an opportunity for the relator to make his position known and to try and convince the government not to dismiss the case. Was there an argument to the court? The relator filed an opposition to the government's motion to dismiss and then filed his own motion for reconsideration and aired all of his arguments. So this was decided on the papers? Yes, that's my understanding. What the relator has asked for is an evidentiary hearing. That goes beyond, we think, what the statute provides and that would be appropriate only if the relator had demonstrated a particularized need for a hearing. As the district court found, the relator had failed to do so and it was proper to decide the motion to dismiss on the papers. Let me ask you this. One of the reasons the government gave were what? The reasons the government gave in its motion to dismiss were the need to protect classified information from inadvertent disclosure and the conservation of government resources that would be involved if the case were permitted to go forward. What I wanted to explore a little bit was I can understand the government's concern that litigation would necessarily result in a risk of disclosure of confidential information because there are a lot of legitimate concerns about security. What I have a little trouble with is the argument that you shouldn't have to spend money to protect the security when the purpose of this act is in order to help protect the government and recover when government has been victim of fraud. Doesn't the government spend money all the time trying to protect its security and why should a key time be any different? A couple of things. Certainly the government expends resources to protect national security all the time. The determination was made that allowing this litigation to proceed would actually increase the cost the government would need to incur beyond the baseline that I believe Your Honor is referring to. Examples of that include all of the monitoring of discovery that would have to occur because this litigation relates to a classified program and a classified contract. When either side, and we can expect that the defendant for example would seek substantial discovery from the government about its understanding of what the contract was about and performance issues. Every time a discovery request is made specialized security personnel from the relevant agency will have to review every single document involved to try and make line by line redactions. And as I'm sure the court is aware discovery in these cases can be very significant. We're not talking about five documents. I mean there could be thousands and thousands if not more documents in this case. That's a substantial expenditure of resources. Not only that, the personnel who would be conducting this review are the same security personnel who would be protecting other sorts of information that the agency had. So we're actually creating a diversion of resources away from programmatic needs towards this litigation. The government's determined that that is not in the best interest of the agency to have all of these security personnel working on this one case. And one step further, as explained in the declaration that the court has, the agency determined that even with all of these steps that would not be sufficient to protect the information at issue here. The agency determined that line by line redactions would not be sufficient because of the volume of information that we're talking about and the nature of the information that things could slip through that aren't apparent kind of looking one document at a time. But someone who could look at the body of information may be able to piece together associations and programmatic needs that aren't evident just by looking at one document at a time. And that wouldn't even begin to address all of the world testing. That gets to be a little remote. What did the district court have before it in terms of the understanding of the size of the project and therefore the nature of the... The district court had the same declaration that was submitted to your honors. That declaration laid out the nature of the classified information at stake, why a kind of line by line redaction process would not be sufficient to protect the information. And it also laid out in considerable detail the harm to national security that could be expected to result if the information were disclosed. And I'd like to point the court to the 10th Circuit's decision in Rittenhour which involved similar circumstances of a false claims act, a key tam action involving classified information. And the 10th Circuit pointed out that the risk of harm to national security even if theoretically minimal was sufficient to justify dismissal under the Sequoia Orange standard which is a rational basis standard and just requires the identification of a plausible or rational basis there. I take it you don't need to rely on the monitoring argument. I'm sorry? You don't really need to use the cost argument, do you, if there's a risk of disclosure? No, we believe that these are... I mean there's some relation between them because they both go to the fact of involvement of classified information but just the need to protect the information. We don't need to invoke the cost. The agency that is responsible for the protection of this information has made an assessment that... That's the real interest, isn't it? No, I think they're both very real interests. And this court has endorsed consideration... That's the bigger interest. You wouldn't need the cost if you didn't have the concern about the disclosure. Well, yes, the risk of disclosure heightens the cost but in Sequoia Orange, the government pointed to the cost of continuing litigation as a reason to dismiss it and this court said that in that case there was no classified information involved. It was marketing orders by the Secretary of Agriculture governing citrus industry. This court said that the government could properly consider the burden on taxpayers of continuing the litigation and it said that the government would incur enormous internal costs. We've gone beyond that. I'm sorry? We've gone beyond all that. In what way? I'm sorry. I can't tell you that. Here, the reason for the cost is because they're concerned about the classified information. That's the reason why the costs are enhanced but there still would be... Well, if there was no classified information no one would have to be reviewing this. It all derives from the idea that there's classified information at stake. No, I would like to push back slightly on that. In a case such as this where a relator is challenging a government contract, we can expect that there would be substantial discovery demands put on the government. Like I said, the defendant, for example, may wish to assert a claim that these were not material breaches so it would want to get information... That's fair. There's some resource devotion to just answering discovery requests but what's driving your real concern here, though, is the classified information and the fact that this agency will have to deal with that, right? And this is a motion to dismiss. I mean, it hasn't even... isn't it? Yes, it is a motion to dismiss. We haven't had any discovery yet, so... That's exactly right and that's why the government moved to dismiss so that it could avoid those costs and just not get into any of that, which Congress specifically gave it the power to do in 3730 C2A. If the court has no further questions we will rest on our breeze. Thank you very much. Okay. Thank you. Anything further? I think the government here is just throwing aside an elaborate statutory scheme in recent years in which Congress and the executive itself has been worried about this over-classification, using classification to keep information that's embarrassing out of the public domain. We have this very odd case, as I said, where the very agency itself is the source of a lot of this public disclosure that the government is very concerned about right now. I can't tell you what's in that affidavit, obviously. I can't tell you the so-called relationship that they see. But it seems in this case we have a... I mean, the way the government has changed its rationale for we have to suppress all of this, it doesn't smell right, quite frankly. Something doesn't smell right and we need a hearing. We're entitled to a hearing. We can explore, I think, with the government and with Raytheon, why they feel we couldn't deal with the issues of the false claims in the narrow focus that the government has permitted to be dealt with because the government never redacted any of these false claims. Not once. What would you have said at a hearing that you haven't said already? What would I have said at a hearing? No, I haven't had an opportunity even to question Raytheon and the government. What we said... So the hearing you're envisioning has to be an evidentiary one in which you could cross-examine government witnesses. Correct. Not just an oral argument. And Raytheon. So you're saying you were entitled to more than just oral argument on your motion. Correct. Correct. Because, you know, I have no... Or, you know, what we know is the government never redacted anything from the false claims, which are fairly simple. You can say, here's a false claim. This is a government contract requirement and it wasn't followed and it was not... It was deliberately not followed. So, but... We got no hearing on that. Okay. Thank you. All right. That takes care of the matters this morning and we'll recess until 9 a.m. tomorrow.
judges: Schroeder, Pregerson, Friedland